UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY WHEELER,

                Plaintiff,                         Case No. 13-cv-15210
                                                      Hon. Matthew F. Leitman

v.

MICHAEL TOCARCHICK *et al.*,

                Defendants.

_____/

## ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF #67) AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF #66)

On March 8, 2011, Plaintiff Kimberly Wheeler ("Wheeler") was involved in a minor traffic accident outside of the Genesee County Sheriff's Department. What happened next forms the basis of this lawsuit.

According to the Defendants (who were all employees of the Sheriff's Department at the time of the accident), Wheeler was belligerent, vulgar, impossible to calm down, and appeared to be under the influence of drugs. They say that her behavior left officers no choice but to arrest and detain her until they believed she was no longer intoxicated.

Wheeler maintains that she was neither disorderly nor under the influence. She insists that officers wrongfully arrested her, assaulted her, and subjected her to

1

an invasive and embarrassing strip search.  She also alleges that officers unlawfully detained her for roughly twenty-four hours after arresting her.  She seeks damages for alleged violations of state and federal law. (*See* Compl., ECF #1.)

The parties have now filed cross-motions for summary judgment. Defendants seek summary judgment on all of Wheeler's claims (the "Defendants' Motion"). (*See* ECF #67.)  Wheeler moves for summary judgment on her claims based upon her arrest and post-arrest detention ("Wheeler's Motion"). (*See* ECF #66.)  For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** the Defendants' Motion and **DENIES** Wheeler's Motion.

## I

In the early afternoon on March 8, 2011, Wheeler drove to the Genesee County Sheriff's Department.  While parking, Wheeler collided with another car. The parties tell vastly different stories about what followed.

## A

According to Defendants, officers first learned about the accident from a woman named Takeisha Major ("Major").  Major came into the sheriff's department and began speaking with Defendant Michael Tocarchick ("Tocarchick"), then a lieutenant with the department.  Major told Tocarchick that "she had just been struck on Saginaw Street in her vehicle and that the person that

2

did it wasn't cooperating with her." (Tocarchick Dep. at 48, ECF #67-7 at 14, Pg. ID 1157.)   Major said that the "person that did it" was Wheeler, and she told Tocarchick that Wheeler was standing in the lobby of the department. (*See id.* at 48, 52-53, ECF #67-7 at 14-16, Pg. ID 1157-59.)

Tocarchick then located Wheeler, and he, Wheeler, Major, and Defendant Michael Cherry ("Cherry"), a sheriff's deputy, went to the scene of the accident. Tocarchick says that as the group stepped outside, Wheeler's behavior became "progressively worse" and she appeared "under the influence of something." (*Id.* at 59-61, 76, ECF #67-7 at 17-18, 21, Pg. ID 1159-61, 1164.)   Tocarchick says that when he asked Wheeler if she had taken any substances the day of the accident, Wheeler admitted that she had taken Vicodin at 7:00 a.m. that morning. (*See id*. at 65, ECF #67-7 at 19, Pg. ID 1162.)   According to Tocarchick, Wheeler was acting

> [a]s if – like she stated she had taken something and she was starting to – in my opinion, she was getting more under the influence of a narcotic, speech was being slurred, very argumentative, cursing, very disorderly . . . . But I was trying to calm her down.
>
> [ . . . . ]
>
> She was having a hard time walking, her eyes . . . were pinpoint, her pupils were pinpoint, very tiny, [and] her speech was slurred.

(*Id.* at 76, ECF #67-7 at 21, Pg. ID 1164.)

After viewing the scene of the accident, Tocarchick, Wheeler, Major, and Cherry returned to the department's squad room. Wheeler continued "cursing," was "argumentative," and refused to listen to orders from officers to sit down. (*Id.* at 84, ECF #67-7 at 23, Pg. ID 1166.)   According to Defendant Gerald Parks ("Parks"), who was a sergeant with the department at the time, officers "requested over and over [that Wheeler] calm her voice," and Parks warned her that if she did not calm down, she could be arrested. (Parks Dep. at 28, 34-35, ECF #67-8 at 9, 11, Pg. ID 1193, 1195.)

Based on her behavior and admission that she had taken Vicodin, Tocarchick told Wheeler that he would not allow her to drive herself home.  (*See* Tocarchick Dep. at 79-81, ECF #67-7 at 22-23, Pg. ID 1165-66.)  He insists that he then offered to help her find a ride. (*See id.* at 80, ECF #67-7 at 22, Pg. ID 1165.) Tocarchick says that in response, Wheeler remained agitated and used the "F word several times." (*Id.* at 79, ECF #67-7 at 22, Pg. ID 1165.)

Wheeler then approached Tocarchick.  In Parks' words, she "closed the distance between her[self] and Tocarchick," and Parks believed that "it was going to become a physical confrontation." (Parks Dep. at 35, ECF #67-8 at 11, Pg. ID 1195.)  Because Parks "did not want it to [become] a physical confrontation," he

4

arrested Wheeler for violating Michigan's "disorderly person" statute, M.C.L. § 750.167(1)(e). (*Id.*)

Parks then escorted Wheeler into an interview room. As they reached the doorway, Tocarchick says that Wheeler "stopped" and "would not go in" to the room. (*Id.* at 141, ECF #67-7 at 38, Pg. ID 1181.) Parks then "helped" Wheeler through the doorway, and when he did so, Wheeler fell. (*Id.*; *see also id.* at 89, ECF #67-7 at 25, Pg. ID 1167.)

A short time later, Defendants Stadler and Stocchi attempted to conduct a "pat down" search of Wheeler. (*Id.* at 141-42, ECF #67-7 at 38, Pg. ID 1181.) But Wheeler resisted and "kept pulling away from them, turning around on them." (Michael Chatterson Dep. at 60, ECF #67-9 at 17, Pg. ID 1222.) Officer Michael Chatterson ("Chatterson") then entered the room and "took [Wheeler] down to the ground to gain control" of the situation. (*Id.* at 65-66, ECF #67-9 at 19, Pg. ID 1224.) The officers then handcuffed Wheeler, and two female officers (who were not Stadler or Stocchi, the only female Defendants named in this action) transported Wheeler to the Genesee County Jail. (*See* Tocarchick Dep. at 106, ECF #67-7 at 29, Pg. ID 1172.)

The following day, Tocarchick visited Wheeler at the jail. (*See id.* at 143, ECF #67-7 at 38, Pg. ID 1181.) Tocarchick says that he wanted "[t]o see what

5

[Wheeler's] demeanor was at that time after she had possibly come off [of] suspected narcotics." (*Id.*)   According to Tocarchick, Wheeler "was very apologetic, even remembered cursing in front of [a] child, [and] she said she shouldn't have [acted] that way." (*Id.* at 144, ECF #67-7 at 38, Pg. ID 1181.) Tocarchick says that he then made the decision to release Wheeler without filing any charges against her. (*See id.* at 144-145, ECF #67-7 at 38-39, Pg. ID 1181-82.) Tocarchick says that Wheeler's release was consistent with the department's usual practice:

> [T]he norm is[,] if somebody comes in and they don't take a [drug] test, it's a 24-hour period.  It was right on the 24-hour period that I released [Wheeler] out of the jail, so I knew absolutely that she could drive her vehicle. So it was 24 hours.

(*Id.* at 144, ECF #67-7 at 38, Pg. ID 1181.)   Tocarchick released Wheeler at approximately 1:00 p.m.

## B

Wheeler does not dispute Defendants' broad sketch of what happened after her accident with Major.  For instance, she acknowledges that Tocarchick refused to allow her to drive home; that she cursed at him and other officers; that officers used some degree of force when arresting and transporting her to the Genesee County Jail; and that she was released without charges after spending about 24

6

hours in custody.  But the specifics of Wheeler's account differ substantially from Defendants' version of events (set forth above).  Wheeler insists that the Defendant officers "made a lot of stuff up" (Wheeler Dep. at 98, ECF #67-11 at 27, Pg. ID 1288), and that much of what Defendants say "didn't happen."[1] (*Id.* at 109, ECF #67-11 at 29, Pg. ID 1290.)

Wheeler insists that she was not "out of control," "disorderly," or "violating the law." (*Id.* at 111-12, ECF #67-11 at 30, Pg. ID 1291.)  Wheeler also disputes Tocarchick's claim that she told him that she had taken Vicodin on the morning of the accident. (*See id.* at 108, ECF #67-11 at 29, Pg. ID 1290.)  Wheeler further denies that Tocarchick ever offered to help find her a ride home. (*See id.* at 108-09, ECF #67-11 at 29, Pg. ID 1290.)  In fact, Wheeler says that officers refused to allow her to use a phone to call for a ride. (*See id.* at 110, ECF #67-11 at 30, Pg. ID 1291.)  Finally, Wheeler admits to cursing at officers, but insists she did so only after the officers threatened to stun her with a taser. (*See id.* at 107, 111, ECF #67-11 at 29-30, Pg. ID 1290-91.)

Moreover, Wheeler says that officers subjected her to three separate physical assaults.  First, she says that Parks threw her down onto the floor of the interview

---

[1] *See also* Wheeler Dep. at 114, ECF #67-11 at 31, Pg. ID 1292 ("I disagree with a lot of things [Defendants say about what happened]. And I believe everybody who knows [Tocarchick] is coming together and saying a bunch of BS about me that ain't even close to the truth. They're covering for each others' asses.")

7

without warning or provocation room after she was arrested.  (*See id.* at 125, ECF #67-11 at 33, Pg. ID 1294.)  Wheeler says that the assault "busted [her] fingernail off" leading to her "bleeding everywhere."[2]  (*Id.*)  Next, Wheeler says that a "heavyset" officer – later identified as Chatterson – "stood" and "stomped" on her back while handcuffing her, causing her pain and injury.  (*Id.* at 131, ECF #67-11 at 35, Pg. ID 1296.)  Wheeler says that Chatterson refused to stop putting pressure on her back even though she told him "I have a broken back.  You cannot do this to me, I have a bladder disease.  You are hurting me." (*Id.*)  Finally, Wheeler says that as she was being escorted to the Genesee County Jail, two unidentified female officers "bashed [her] face in the back of [an] elevator." (*Id.* at 145, ECF #67-11 at 38, Pg. ID 1299.)  Wheeler also says that these officers "punch[ed] [her] over and over" and "beat the hell out of [her]." (*Id.* at 149, 151, ECF #67-11 39-40, Pg. ID 1300-01.)  Wheeler further claims that these officers forced her to "take all [her] clothes off" so that they could perform an invasive strip search before she was held in jail overnight. (*Id.* at 153-54, ECF #67-11 at 40-41, Pg. ID 1301-02.)

---

[2] Wheeler testified that she was "absolutely certain" that Tocarchick was the officer who threw her down in the interview room and injured her fingernail. (*See* Wheeler Dep. at 129, ECF #67-11 at 34, Pg. ID 1295.)  However, the parties now agree that the officer involved in that alleged assault was in fact Parks.

## II

Wheeler filed this action on December 23, 2013. (*See* Compl., ECF #1.)  She has named Genesee County and officers Tocarchick, Parks, Chatterson, Rebecca Stadler ("Stadler"), and Christina Stocchi ("Stocchi") as Defendants.[3] (*See id.*)  She asserts the following claims:

- In Count I, Wheeler brings claims under 42 U.S.C. § 1983 for "unlawful arrest, search and seizure, retaliatory arrest, and false imprisonment."
- In Count II, Wheeler claims that the Defendants are not entitled to qualified immunity.
- In Count III, Wheeler alleges that the Defendants violated the Fourth Amendment when they subjected her to excessive force.
- In Count IV, Wheeler alleges that Defendants violated the Fourth Amendment when they failed to protect her from harm.
- In Count V, Wheeler claims that Defendants violated 42 U.S.C. § 1985(3) when they participated in a conspiracy to interfere with her civil rights.
- In Counts VII – XIV, Wheeler brings state law claims for assault, battery, false imprisonment, intentional infliction of emotional distress, gross negligence, conspiracy, concert of action, and aiding and abetting.

On December 7, 2016, Defendants moved for summary judgment on all counts of Wheeler's Complaint. (*See* ECF #67.)  Wheeler also moved for summary judgment on her claims that arise from her allegedly unlawful arrest and her post-

---

[3] Wheeler has since withdrawn her claim against Genesee County. (*See* Wheeler Resp. Br. at 22, ECF #70 at 25, Pg. ID 1509.)

arrest detention. (*See* ECF #66.)  The Court held a hearing on both motions on May 4, 2016.

## III

Defendants argue that they are entitled to summary judgment on the basis of qualified immunity.  The summary judgment standard and its application in the qualified immunity context are well established.

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ."  *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252.  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52.  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Once raised, it is the plaintiff's burden to show that the defendant[] [is] not entitled to qualified immunity." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

The Sixth Circuit "has generally used a two-step [qualified immunity] analysis: (1) viewing the facts in the light most favorable to the plaintiff, [the court] determines whether the allegations give rise to a constitutional violation; and (2) [the court] assesses whether the right was clearly established at the time of the incident." *Id.* (internal punctuation omitted). "[U]nder either prong [of this inquiry], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Indeed, in *Tolan*, the Supreme Court vacated a grant of summary judgment on a qualified immunity defense because, among other things, the lower court "credited the evidence of the party seeking summary judgment and failed to properly acknowledge key evidence offered by the party opposing that motion." *Id.* at 1867-68. The Supreme Court explained that "[b]y weighing the evidence and reaching

11

2:13-cv-15210-MFL-MJH   Doc # 75   Filed 07/06/16   Pg 12 of 29   Pg ID 1693

factual inferences contrary to [the non-moving party's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.* at 1867. Simply put, "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Green*, 681 F.3d at 864.

## IV

Conceptually, all of Wheeler's claims can be separated into three distinct categories: (1) claims related to her arrest; (2) claims related to the three alleged assaults and strip search; and (3) claims related to her post-arrest detention. The Court will address each in turn.

## A

Wheeler was arrested for violating Michigan's "disorderly person" statute, M.C.L. § 750.167(1)(e). That statute provides, in relevant part, that "[a] person is a disorderly person" if she "is intoxicated in a public place and [] is either endangering directly the safety of another person or of property or is acting in a manner that causes a public disturbance." M.C.L. § 750.167(1)(e). Defendants argue that Wheeler's arrest for violating this statute was proper as a matter of law; Wheeler counters that it was improper as a matter of law. For the reasons

explained below, the Court concludes that the lawfulness of Wheeler's arrest is a question for the jury. However, all of the Defendants other than Tocarchick and Parks are entitled to summary judgment on Wheeler's arrest-related claims because they had no involvement in her arrest.

## 1

"An officer has probable cause [to arrest] when the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." *Miller v. Sanilac Cty.*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Green*, 681 F.3d at 865 (quoting *Parsons v. City of Pontiac,* 533 F.3d 492, 501 (6th Cir. 2008).

Tocarchick and Parks are not entitled to summary judgment on Wheeler's arrest-related claims because there is more than one reasonable determination possible as to whether they had probable cause to arrest Wheeler. Wheeler testified that she was "not out of control," was "not disorderly," was not violating the law, and was not impaired. (Wheeler Dep. at 111-12, ECF #67-11 at 30, Pg. ID 1291.) That testimony, if believed by a jury, would be sufficient to support a finding that Parks and Tocarchick lacked a reasonable basis to conclude that

Wheeler was violating Michigan's disorderly person statute. The Court denies Tocarchick and Parks judgment as a matter of law on those claims.

## 2

Wheeler argues that she is entitled to summary judgment on her arrest-related claims because she did not violate the "public disturbance" provision of Michigan's disorderly person statute, M.C.L. § 750.167(1)(e). She relies on the Michigan Court of Appeals' construction of the "public disturbance" provision in *People v. Gagnon*, 241 N.W.2d 867 (Mich. App. 1983). In *Gagnon*, the court interpreted the provision "to require a finding that an accused, while intoxicated, directly endangered the safety of another person or of property." *Gagnon*, 241 N.W.2d at 870. Wheeler insists that even if she was otherwise disorderly, she did not endanger the safety of another person or property, and thus the officers could not have had probable cause to arrest her.

However, there is evidence in the record that Wheeler did pose a possible safety threat. Parks testified that he arrested Wheeler in part because he believed that she posed a potential physical threat:

> Q:   Why did you arrest her when an officer superior to you was in direct contact with her for at least four minutes that you know about who didn't arrest her?

14

A:     That's the part of the report that I question because of the situation you just said.  I do recall telling Mrs. Wheeler that if she didn't calm down, she could be arrested for disorderly.  That's when I stepped back into the room, *she had closed the distance between her and Tocarchick to a point I thought it was going to become a physical confrontation over an argument over the fact that he was holding on to her purse.*

Q:     Why would you have even spoken to her if Lieutenant Tocarchick was in contact with her?

A:     Why did I speak to Mrs. Wheeler?  *Because she closed the distance between her and Tocarchick, I did not want it to get into a physical confrontation. I would have been his backup.*

[ . . . . ]

Q:     Did you ever see her raise her arms in a threatening way to strike him?

A:     I believe she was trying to grab her purse [which Tocarchick had in his possession].  That's what the distance was closed for.  *I don't know if she ever came into physical contact with [him] but the distance closed rapidly to within a couple of inches.*

(Parks Dep. at 34-36, ECF #67-8 at 11, Pg. ID 1195; emphasis added.)  A jury crediting Parks' testimony could conclude that Parks had a reasonable basis to believe that Wheeler posed a threat to Tocarchick's safety.  Thus, Wheeler is not entitled to summary judgment on her arrest-related claims.

15

**B**

As described above, Wheeler claims that she was subject to three separate actionable assaults. She has brought three claims related to these assaults: a federal claim of excessive force under the Fourth Amendment and two state law claims for assault and battery. She also alleges that the Defendants engaged in a conspiracy or concerted action with respect to the assaults. The Defendants seek summary judgment on all of the claims. The Court will analyze each claimed assault individually and will then analyze Wheeler's claims that the Defendants engaged in a conspiracy or other concerted action related to the assaults.

**1**

The determination as to whether a police officer has exerted excessive force during the course of a seizure is reviewed "under the Fourth Amendment's objective reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "[T]he question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal quotation marks omitted). Moreover, "the right to be free from excessive force is a clearly established Fourth Amendment right." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004). For example, it is clearly established that "officers

16

cannot use force . . . on a detainee who has been subdued . . . or is not resisting arrest." *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009).  Nor may officers slam individuals to the ground where there is no provocation for the use of that force. *See Harris v. Langley*, --- Fed. App'x ---, 2016 WL 2610252, at *4 (6th Cir. May 6, 2016) ("[T]here is no opacity in the Fourth Amendment's prohibition on unprovoked body slams from police officers . . . .").

Wheeler first claims that Parks subjected her to excessive force when he shoved her into the interview room.  Wheeler says that while she was answering question about whether she was pregnant, she was suddenly and violently thrown to the ground:

> A:    As soon as I said I'm not pregnant, he throwed [sic] me down on the floor so hard.
>
> [ . . . . ]
>
> Q:    When he threw you on the floor how did he do that?
>
> A:    He took his arms and he . . . . wham . . . . He just really gave me this huge shove and I was halfway across the room, and now I'm bleeding all over.

(Wheeler Dep. at 105, ECF #67-11 at 28, Pg. ID 1289.)  Parks, on the other hand, denies that he pushed or shoved Wheeler and denies causing her injuries. (*See*

Parks Dep. at 42-43, ECF #67-8 at 13, Pg. ID 1197.) Parks says that he "guided" Wheeler to the interview room by holding on to her wrist, and that Wheeler then dug her fingernails into him with such force that it caused him to begin bleeding. (*See id.* at 39, 42, ECF #67-8 at 12-13, Pg. ID 1196-97.) Moreover, Tocarchick testified that Wheeler had "stopped" and refused to enter the interview room voluntarily. (*See* Tocarchick Dep. at 141, ECF #67-7 at 38, Pg. ID 1181.)

If Parks and Tocarchick's version of events is accepted, Parks would be entitled to qualified immunity for the first alleged assault; if Wheeler's version is accepted, Parks would not be entitled to such immunity. Given the factual dispute between Parks and Wheeler concerning the first alleged assault, Parks is not entitled to summary judgment on the claim based upon that assault. *See Green*, 681 F.3d at 864 ("[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability."); *Grawey*, 567 F.3d at 312 (6th Cir. 2010) (officer's "contentions . . . must be rejected for qualified immunity analysis because they are premised on [the officer's] version of the facts . . . . These material facts are disputed by [the plaintiff] and are therefore for a jury to decide at trial."). (However, if and to the extent that Wheeler is asserting a claim against any of the other Defendants for excessive force related to this alleged assault, they are entitled to summary

judgment because there is no evidence that any other Defendant participated in this claimed assault.)

Second, Wheeler asserts that Chatterson subjected her to excessive force when he forced her to the ground and handcuffed her. Chatterson says he exerted this force only after witnessing Wheeler repeatedly resist the pat-down search that officers Standler and Stocchi were attempting to perform. (Chatterson Dep. at 60, 65-66, ECF #67-9 at 17, 19, Pg. ID 1222, 1224.) Chatterson also says that he never placed his knee on her back and did not otherwise use any "pressure points" to get control of Wheeler. (*Id.* at 67-68, ECF #67-9 at 19, Pg. ID 1224.) Wheeler, on the other hand, denies that she was ever asked to submit to a pat-down search, denies resisting the instructions of officers Stadler and Stocchi, and says that Chatterson "stomped" on her and put pressure on her back even though she was not resisting and even after she told him she had previous back and bladder injuries. (Wheeler Dep. at 130-31, ECF #67-11 at 35, Pg. ID 1296.) As with Parks' entitlement to qualified immunity for the first alleged assault, Chatterson's entitlement to qualified immunity depends upon which version of events is credited. Thus, Chatterson is not entitled to summary judgment on Wheeler's second assault claim. *See Green*, *Grawey*, *supra.* (However, if and to the extent that Wheeler is asserting her second assault claim against any of the other

Defendants, they are entitled to summary judgment because there is no evidence that any other Defendant participated in this claimed assault.)

Third, Wheeler alleges that two unidentified female officers "beat the hell out of [Wheeler]" in an elevator when these officers were transporting Wheeler to the Genesee County Jail. (Wheeler Dep. at 149, 151, ECF #67-11 at 1300-01.) Wheeler also claims these same officers subjected her to an unlawful and invasive strip search. (*Id.* at 145, 153-54, ECF #67-11 at 1299, 1301-02.)

But Wheeler has not named these officers as Defendants in this action. In fact, Wheeler acknowledges that the two women she has named as Defendants – Defendants Stocchi and Stadler – are *not* the women who attacked her or subjected her to the strip search. And despite having the opportunity to take discovery to identify her alleged attackers, Wheeler has not identified them and cannot identify them.[4]  Because Wheeler has failed to identify any evidence that any named

---

[4] Wheeler could have served discovery requests on the Genesee County Sheriff's Department for time records in order to determine which officers were working on the night Wheeler says she was assaulted. She also could have sought photographs of the employees working that night in an effort to identify the female officers who allegedly attacked her. Wheeler did neither. At oral argument, Wheeler argued that she could not have taken discovery with respect to which officers subjected her to the invasive strip search because it was Defendants' position that the strip search never happened. And, in fact, Defendants did deny that the strip search took place in a May 1, 2015, response to a request for admission. (*See* ECF #70-16 at 3, Pg. ID 1608.) But despite Defendants' denials, Wheeler still could have engaged in the discovery described above in order to identify the female officers

Defendant had anything to do with her third alleged assault and strip search, all Defendants are entitled to summary judgment with respect to this claim related to that alleged assault and the alleged strip search.

**2**

Defendants Parks and Chatterson are not entitled to governmental immunity as a matter of law with respect to Wheeler's state-law claims of assault and battery. "To qualify for governmental immunity under Michigan state law for intentional torts such as assault and battery, a governmental employee must establish that: (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed he was acting, within the scope of his authority, (2) the employee undertook the challenged acts in good faith or without malice, and (3) the acts were discretionary, rather than ministerial, in nature." *Binay v. Bettendorf*, 601 F.3d 640, 653 (6th Cir. 2010) (citing *Odom v. Wayne County,* 760 N.W.2d 217, 228 (Mich. 2008)).  This immunity "'protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.' That malicious intent is defined as 'conduct or a failure to act that was intended to harm the plaintiff . . . [or] that shows such indifference to whether harm will result as to be

_____

she says attacked her and subjected her to the strip search.  She did not.

equal to a willingness that harm will result.'" *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015) (quoting *Odom*, 760 N.W.2d at 225, 228).

Taking Wheeler's version of events as true, "[a] jury could find that [the actions of Parks and Chatterson] show[ed] such indifference to whether harm would result as to be equal to a willingness that harm would result." *Brown*, 779 F.3d at 421 (internal punctuation omitted). Therefore, neither Parks nor Chatterson is entitled to summary judgment with respect to Wheeler's claims of assault and battery on the basis of governmental immunity.

**3**

In addition to alleging that certain Defendants actually assaulted her, Wheeler alleges that all of the Defendants are liable for the assaults because they entered into a conspiracy or undertook other concerted action related to the assaults or aided and abetted the assaults. But Wheeler has failed to identify any evidence in the record to support these claims. For example, she has not brought forth any evidence that the Defendants entered into any agreement to harm or assault her, nor that any Defendant had advance knowledge that an assault and/or battery was going to occur. Therefore, Defendants are entitled to summary judgment on each of these claims.

22

For the same reason, the Defendants are entitled to summary judgment on Wheeler's claim that they were grossly negligent in failing to prevent the alleged assaults.[5]   Wheeler has not presented any evidence that any of the Defendants could have stopped the alleged assaults but did not.   Simply put, there is no evidence that any Defendant unreasonably failed to prevent any of the alleged assaults.   Thus, no Defendant may be held liable on Wheeler's gross negligence claim.

## C

Finally, Wheeler and the Defendants each move for summary judgment with respect to Wheeler's claims based on her post-arrest detention.

As an initial matter, all Defendants other than Tocarchick are entitled to summary judgment on those claims.   There simply is no evidence that any Defendant other than Tocarchick (1) had any control or influence over the length

---

[5] To the extent Wheeler is attempting to claim that Defendants Parks and Chatterson were grossly negligent when they allegedly assaulted her, such a claim must fail.   "Although establishing that a governmental official's conduct amounted to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action. The only cause of action available to plaintiff for allegations of this nature would be for assault and battery."  *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011) (reversing district court's failure to deny summary judgment to defendants on summary claim of gross negligence under Michigan law).

23

of Wheeler's post-arrest detention, or (2) had the ability to bring Wheeler before a judicial officer for arraignment following her arrest.

Tocarchick argues that he is also entitled to summary judgment on Wheeler's post-arrest detention claims. He insists that he had probable cause to suspect Wheeler was intoxicated and had violated Michigan law and thus that his decision to detain Wheeler after her arrest was lawful. (*See* Defs.' Mot. Summ. J. at 16-17, ECF #67 at 26-27, Pg. ID 1105-06.) But that argument fails for two reasons. First, as discussed at length above, when the Court views the facts in the light most favorable to Wheeler, it cannot conclude as a matter law that there was probable cause for Wheeler's arrest and detention. Thus, Tocarchick's argument that Wheeler's detention did not violate Wheeler's rights as a matter of law because there was probable cause for her arrest fails.

Second, even if officers had probable cause for arresting Wheeler, that does not invariably mean that Wheeler's detention – which lasted nearly twenty-four hours – was itself lawful. The Fourth Amendment "requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest." *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) (citing *Gerstein v. Pugh,* 420 U.S. 103 (1975)). And while the Supreme Court has held that "a jurisdiction that provides judicial determinations of probable

24

cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*," a shorter period of incarceration could violate the Fourth Amendment if "the arrested individual can prove that his or her probable cause determination was delayed unreasonably." *Riverside*, 500 U.S. at 56. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.*

The facts viewed in Wheeler's favor could support a finding of "delay for delay's sake." At his deposition, Tocarchick was asked directly why he held Wheeler in custody for so long without release or a hearing. He had no explanation for the length of the detention and said only that during the course of the detention he may have been "deciding" what to do:

> Q:   So [Wheeler] was kept for over 24 hours?
>
> A:   I'd say right at 24 hours. . . .
>
> Q:   Why was she kept that long if no request was made for a warrant or complaint?
>
> A:   *That's what time we released her. Maybe we were just, you know, deciding*.
>
> Q:   What was that last part?
>
> A:   I was deciding.

(Tocarchick Dep. at 124-25, ECF #67-7 at 33-34, Pg. ID 1176-77; emphasis added.)[6]  A jury could find that Tocarchick lacked any meaningful justification for Wheeler's twenty-four detention and that Tocarchick delayed Wheeler's release "for delay's sake."   Thus, Tocarchick is not entitled to summary judgment on Wheeler's post-arrest detention claims.

Nor is Wheeler entitled to summary judgment on her post-arrest detention claims.   When the evidence is viewed in Tocarchick's favor, a jury could reasonably conclude that there was probable cause for Wheeler's arrest, that Tocarchick had a reasonable basis to believe that she was under the influence, that she insisted upon driving herself upon her release, and that Tocarchick acted reasonably in detaining her for twenty-four hours to ensure her sobriety.

Wheeler resists this conclusion.   She argues that Tocarchick should have promptly brought her before a judge of Michigan's 68th District Court for a probable cause hearing.   According to Wheeler, that court "opened its doors at 8:00

---

[6] At a different point during his deposition, when he was asked a question on a different subject, Tocarchick referenced a department policy to release arrested individuals suspected of intoxication after 24 hours. (*See* Tocarchick Dep. at 144, ECF #67-7 at 38, Pg. ID 1181 ("[T]he norm is[,] if somebody comes in and they don't take a [drug] test, it's a 24-hour period.  It was right on the 24-hour period that I released [Wheeler] out of the jail.").)   But Tocarchick did not say that Wheeler was released from custody pursuant to this policy. In any event, a jury could credit Tocarchick's testimony, quoted above, that Wheeler was held in custody for 24 hours because he might have been "deciding" what to do during that time period.

a.m." on March 9, 2015 (five hours before Tocarchick eventually released Wheeler) and was "approximately 50 yards" from where she was held. (Wheeler's Mot. Summ. J. at 14, ECF #66 at 21, Pg. ID 1013.)  She insists that "no defendant could with a straight face contend that five additional hours in jail *after* a magistrate became available was necessary for any legitimate administrative reason." (*Id.*; emphasis in original.)

But gaps in the record preclude summary judgment on this theory.  Even if the 68th District Court was "open" to the public at 8:00 a.m. on March 9, 2015, Wheeler has not presented any evidence that a judicial officer was actually available to conduct a probable cause hearing before Tocarchick made the decision to release her from custody nor that a probable cause hearing actually could have been held before Tocarchick released her.  Accordingly, she is not entitled to summary judgment on her theory that Tocarchick unreasonably failed to present her to a judicial officer for a probable cause hearing on the morning of March 9, 2015.

## V

For the reasons stated above, **IT IS HEREBY ORDERED THAT** Defendants' Motion for Summary Judgment (ECF #67) is **GRANTED IN PART**

27

**AND DENIED IN PART** as reflected above, and Wheeler's Motion for Summary Judgment (ECF #66) is **DENIED**.

The remaining claims for trial in this case are as follows:

- Wheeler's Fourth Amendment claims for unlawful arrest against Defendants Tocarchick and Parks;

- Wheeler's Fourth Amendment excessive force and state law assault and battery claims against Defendants Parks and Chatterson;

- Wheeler's Fourth Amendment and state law false imprisonment claims against Defendant Tocarchick.

- Wheeler's claim for intentional infliction of emotional distress against Defendants Tocarchick, Parks, and Chatterson.[7]

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: July 6, 2016

---

[7] While Defendants moved for summary judgment on "all" of Wheeler's claims, Defendants' Motion did not include any argument with respect to Wheeler's intentional infliction of emotional distress claim. Defendants Tocarchick, Parks, and Chatterson are therefore not entitled to summary judgment on this claim.

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 6, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113